UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Daniel Elex,

               Plaintiff,                **MEMORANDUM OPINION
AND ORDER**
v.                                        Civil No. 12-3206 ADM/JJK

Chad Glirbas, Jeremy Halek,
Robert Roushar,
and City of Brooklyn Park,

               Defendants.

---

Joshua R. Williams, Esq., and Timothy M. Phillips, Esq., Law Office of Joshua R. Williams, PLLC, Minneapolis, MN, on behalf of Plaintiff.

Jon K. Iverson, Esq., and Stephanie A. Angolkar, Esq., Iverson Reuvers Condon, Bloomington, MN, on behalf of Defendants.

---

## I. INTRODUCTION

On April 18, 2014, the undersigned United States District Court Judge heard oral argument on Defendants Chad Glirbas, Jeremy Halek, Robert Roushar, and City of Brooklyn Park's (collectively, "Defendants") Motion for Summary Judgment [Docket No. 14] and Defendants' Motion to Exclude Plaintiff's Expert Witness [Docket No. 21]. Plaintiff Daniel Elex opposes both motions. For the reasons set forth below, Defendants' motion for summary judgment is granted in part and denied in part, and Defendants' motion to exclude Plaintiff's expert witness is granted in part and denied in part.

## II. BACKGROUND[1]

This case arises from a police pursuit and arrest of Daniel Elex in 2007. Elex asserts

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

claims under 42 U.S.C. § 1983, alleging that during his arrest Defendant police officers used excessive force in violation of the Fourth and Fourteenth Amendments.[2]

On June 15, 2007, Elex, who was then thirteen years old, was riding in the front passenger seat of an Infiniti driven by his friend Antwain Lee. First Angolkar Aff. [Docket No. 17] Ex. 4 ("Elex Dep.") at 16, 20-22. Elex did not know who owned the car, and Lee did not tell Elex how he obtained the car. Id. at 21. Both Elex and Lee were members of street gangs. Id. at 10-12.

That same day, police officers in Brooklyn Park received information from a concerned citizen about the Infiniti. First Angolkar Aff. Ex. 2 ("Roushar Dep.") at 12-16; Enevoldsen Aff. [Docket No. 18] Ex. 1 ("Police Reports"), at BP 8. The police were told that the car was stolen, that it contained weapons including a sawed-off shotgun and a handgun, and that the occupants were planning a drive-by shooting. Roushar Dep. at 14-16; Police Reports at BP 8. The police searched for the Infiniti, and Officer Roushar ultimately spotted it at Brookdale Drive and Noble Avenue. Roushar Dep. at 12-13.

A police chase began, with Sergeant Roushar leading the pursuit in a fully marked squad car with activated emergency lights. Roushar Dep. at 18-20. Officer Glirbas also gave chase in a separate police vehicle. First Angolkar Aff. Ex. 3 ("Glirbas Dep.") at 13-14. As the police chase continued, the Infiniti accelerated to speeds of approximately 80 miles per hour, hitting

---

[2] The Amended Complaint also asserts a claim against the City of Brooklyn Park pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978) (the "Monell Claim"), and a claim for intentional infliction of emotional distress against all Defendants. See generally Am. Compl. [Docket No. 8]. Elex concedes summary judgment is appropriate on his Monell Claim and claim for intentional infliction of emotional distress. See Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. [Docket No. 31] at 20, n.4.

curbs and street corners. Elex Dep. at 29-30. Because it was daytime and pleasant weather, a number of people were walking on sidewalks and outside in the area of the chase. First Angolkar Aff. Ex. 1 ("Halek Dep.") at 12; Roushar Dep. at 13.

Elex has stated that Lee was being reckless and he was concerned for his own and the public's safety. Elex Dep. at 30; Police Reports at BP 12. He asked to be let out of the car, but Lee did not stop. Elex Dep. at 28, 30; Police Reports at BP 12.

Officer Halek, who was also in the area with his squad car, saw the Infiniti being pursued and took an alternate route to try to cut off its path. Halek Dep. at 11, 13. Halek saw the Infiniti lose control and go into a yard at a slower speed, and he attempted to ram it near the trunk area to cause it to spin and stop the pursuit. Id. at 14. He chose to stop the vehicle because of the severity of the crime, the potential danger of the chase to the public, and the reckless driving by the driver of the stolen vehicle. Id. Ramming the stolen car with Halek's squad car succeeded in stopping the pursuit. Elex Dep. at 29-30. The side air bag deployed, hitting the right side of Elex's head and causing his body to jerk slightly to the left. Id. at 31-32. Elex's face was not injured in the collision. Id. at 53-54; Police Reports at BP 33.

Officer Halek, accompanied by his police canine, exited his squad and prepared to chase any of the suspects who attempted to flee on foot. Halek Dep. at 16. Sergeant Roushar parked his squad and approached the front passenger side of the Infiniti. Roushar Dep. at 21-22. Halek and his canine ran around the back of Halek's squad car to join Sergeant Roushar at the passenger side of the car. Id.

The officers saw Elex hunched over in the car, learning toward the center of the front seat, and reaching down. Halek Dep. at 19; Roushar Dep. at 22. Officer Halek drew his service

revolver while Sergeant Roushar ordered Elex to show his hands and sit up. Halek Dep. at 19-21; Roushar Dep. at 22, 28-29; Elex Dep. at 33-34. Elex raised his hands inside the car. Halek Dep. at 19; Elex Dep. at 64-65.

The officers ordered Elex to get out of the car, but the car door was pinned shut by the squad car. Elex Dep. at 34, 36. Sergeant Roushar then grabbed Elex by the arms and back of his shirt, pulled him through the car's open window, and brought him to the ground so that he was laying face down on his stomach. Elex Dep. at 34-36, 40-41; Roushar Dep. at 22, 25; Halek Dep. at 19-22. Sergeant Roushar ordered Elex to put his hands behind his back and attempted to handcuff him. Roushar Dep. at 49; Halek Dep. at 21; Glirbas Dep. at 14; Elex Dep. at 36.

At this point the officers' testimony of events differs from Elex's. According to the officers, Elex was moving around, attempting to slide away from them, turning his head, and keeping his arms under his body. Halek Dep. at 21-22; Roushar Dep. at 30; Glirbas Dep. at 14-15. Sergeant Roushar gained control over Elex's right arm, but Elex continued to resist and kept his left arm under his body. Halek Dep. at 26; Roushar Dep. at 30. Because the police had been told weapons were involved, Officer Halek was concerned for his and Roushar's safety as well as the safety of those around them. Halek Dep. at 26-27. Elex had not yet been searched and was keeping his hands under his body. Id. at 25, 27. Halek gave Elex multiple commands to put his hands behind his back, but Roushar was only able to get Elex's right hand behind his back. Id. at 25-26. Halek had his gun in his right hand and was holding the canine with his left hand, so he used his foot to kick Elex twice near his left shoulder to get him to comply with the commands to put his hands behind his back. Id.; Police Reports at BP 17-20. After the kicks, it appeared to Halek that Roushar would be able to handcuff Elex, and so Halek stepped back.

4

Halek Dep. at 27-28.  Sergeant Roushar was then able to get control of Elex's left arm to handcuff him.  Id.  Officer Glirbas approached and placed his foot on Elex's head to limit his movement until he was handcuffed.  Glirbas Dep. at 15, 19.  Officer Glirbas and Sergeant Rousher did not see Officer Halek kick Elex.  Roushar Dep. at 31, 34-35; Glirbas Dep. at 15.

   Elex's version of the ensuing events is that as soon as he was on the ground, he moved his hands under his face.  Elex Dep. at 41-42, 44.  The officers commanded Elex to put his hands behind his back, but he did not immediately do so because he was trying to protect his face.  Id. at 41-42, 44.  Sergeant Roushar elbowed and forearmed him in the back of the head.  Id. at 40.  Elex heard the officers shout "stop resisting," and Officer Halek began kicking him in the face.  Id. at 38-40, 42-44.  Elex turned his head from side to side to avoid the kicks, and the motion caused scratches to his face.  Id. at 39, 42, 75.  Officer Halek kicked him about three or four times in the face, including once after Elex had voluntarily put his hands behind his back and been handcuffed.  Id. at 43-44.  After he was handcuffed, Sergeant Roushar and Officer Glirbas picked him up and "slammed" him onto the hood of the stolen vehicle to perform a search.  Roushar Dep. at 36; Glirbas Dep. at 23-24, Elex Dep. at 44.

   No weapons were found, and Elex was escorted to Sergeant Roushar's squad car and taken to jail.  Roushar Dep. at 39.  From jail, Elex requested medical attention and was transported to North Memorial Hospital, where he was diagnosed with a fracture to his left cheekbone.  Elex Dep. at 48, 50.  He also had scratches to his face and suffered a nosebleed that lasted twenty minutes.  Id. at 54, 75.  Elex was prescribed Oxycodone and was told to apply ice to his face and allow it to heal on its own.  Id. at 50-51.  He obtained no further medical treatment.  Id. at 51.  Elex maintains that the cheekbone fracture was caused by Officer Halek's

kicks to his face, and not the vehicle collision. Id. at 53-54.

Approximately five years after the incident, Elex initiated this § 1983 action alleging the officers used excessive force when arresting him. Defendants move for summary judgment, arguing they are entitled to qualified immunity. Defendants also move to exclude Elex's expert witness from testifying in this case.

In arguing they are entitled to qualified immunity, Defendants contend that they used reasonable force when ramming the stolen vehicle with the squad car to end the pursuit. They further argue that the officers' actions in placing Elex on the ground, forearming, elbowing, and kicking him, placing a foot on his head, and pushing him against the hood of the stolen vehicle were all objectively reasonable uses of force because Elex was resisting being handcuffed, and the officers were concerned that he may have been armed. Defendants also argue the force used by Roushar and Glirbas was objectively reasonable because it did not result in injury to Elex.

Elex responds that because he was not resisting arrest, the officers' kicking him and "aggressively slamming" him onto the hood of the stolen vehicle were unreasonable uses of force. Elex further argues that Officer Halek's kicks to his face caused more than de minimis injury, because the kicks fractured his cheekbone. Elex also argues that each of the Defendant officers failed to intervene and stop the unreasonable use of force on Elex.[3]

### III. DISCUSSION

**A. Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure states a court shall grant summary

---

[3] Elex does not argue that Officer Halek's ramming the fleeing vehicle, Glirbas' placing his foot on Elex's head, or Roushar's punching, forearming, and elbowing him were unreasonable uses of force. See generally Pl.'s Mem. Opp'n.

judgment if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.  On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate.  Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (citations omitted).  However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . .  Instead, 'the dispute must be outcome determinative under prevailing law.'"  Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citations omitted).  "In order to survive a motion for summary judgment under § 1983, the plaintiff must raise a genuine issue of material fact as to whether (1) the defendants acted under color of state law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right."  Samuelson v. City of New Ulm, 455 F.3d 871, 875 (8th Cir. 2006) (citing Kuha v. City of Minnetonka, 365 F.3d 590, 596 (8th Cir. 2003)).

**B.  Qualified Immunity**

"Qualified immunity shields government officials from liability and the burdens of litigation in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known."  LaCross v. City of Duluth, 713 F.3d 1155, 1157 (8th Cir. 2013).  "When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated a clearly established right."  Bishop v. Glazier, 723 F.3d 957, 961 (8th Cir. 2013).  Determining whether an official is

entitled to qualified immunity involves a two-pronged inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. See LaCross, 713 F.3d at 1157-58 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). Unless the answer to both questions is yes, the defendant is entitled to qualified immunity. Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009). A court has discretion in deciding which of the two prongs to address first. Pearson v. Callahan, 555 U.S. 223, 236 (2009); LaCross, 713 F.3d at 1157. In this case, the Court will start with the latter prong.

### 1. Clearly Established Right

Whether a constitutional right was clearly established at the time of a defendant's alleged misconduct is a question of law for the court to decide. Bishop, 723 F.3d at 961. "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). In other words, "the unlawfulness of an officer's conduct must be apparent in light of pre-existing law." Id. (internal quotations omitted).

A claim that police officers have used excessive force in the course of an arrest invokes the Fourth Amendment right to be free from unreasonable seizures. Graham v. Connor, 490 U.S. 386, 394-95 (1989). At the time of Elex's arrest in June 2007, it "remained an open question in [the Eighth] circuit whether a plaintiff must demonstrate greater than de minimis injury to establish a use of excessive force that violates the Fourth Amendment." Bishop, 723 F.3d at 962. Some precedents suggested that an officer's use of force resulting in only de minimis injury did not violate a constitutional right. Id. (citing Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir.

8

2005) and Crumley v. City of St. Paul, 324 F.3d 1003, 1007 (8th Cir. 2003)).

In 2011, the Eighth Circuit Court of Appeals clarified that "there is no uniform requirement that a plaintiff show more than de minimis injury to establish an application of excessive force." Chambers v. Pennycook, 641 F.3d 898, 907 (8th Cir. 2011). The Chambers Court reasoned that "[t]he degree of injury should not be dispositive, because the nature of the force applied cannot be correlated perfectly with the type of injury inflicted. Some plaintiffs will be thicker-skinned than others, and the same application of force will have different effects on different people." Id. at 906. Thus, rather than focusing on the consequences of the force used, the focus should instead be "on whether the force applied is reasonable from the perspective of a reasonable officer on the scene at the time the force is used." Id. (emphasis original). Prior to Chambers, however, "[i]t was not clearly established . . . that an officer violated the rights of an arrestee by applying force that caused only de minimis injury." Id. at 908. Thus, when Elex was arrested in 2007, "a reasonable officer could have believed that as long as he did not cause more than de minimis injury to an arrestee, his actions would not run afoul of the Fourth Amendment." Id.

### a. Officers Roushar and Glirbas

Here, there is no dispute that the actions by Officers Roushar and Glirbas did not cause more than de minimus injury to Elex. Elex has testified repeatedly that his fractured cheekbone—the only injury suffered by Elex that was more than de minimis—was caused by Officer Halek's kicks to his face. There is no evidence, or even argument, that Elex was injured when Officer Roushar pulled him from the car, "threw" him to the ground, and elbowed and forearmed him in the back of the head. Similarly, Elex does not testify or argue that he was

injured when Glirbas placed his foot on Elex's head to immobilize him, or when Glirbas and Roushar "slammed" him against the hood of the car.  Thus, Roushar and Glirbas's actions did not violate a right that was clearly established at the time, and they are entitled to qualified immunity on the claim that these actions constituted excessive force.  See Bishop, 723 F.3d at 962 (holding officer entitled to qualified immunity where force caused no more than de minimis injury and thus did not violate clearly established constitutional right); LaCross, 713 F.3d at 1158 (same).

### b.  Officer Halek

Officer Halek's alleged actions of kicking Elex in the face caused more than a de minimis injury to Elex.  At the time of Elex's arrest, the right to be free from excessive force was a clearly established right under the Fourth Amendment.  See Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998).  Therefore, the other qualified immunity prong must be analyzed to determine whether, viewing the alleged facts in the light most favorable to plaintiff Elex, the force used by Halek was excessive.

### 2. Constitutional Violation

Courts apply an objective "reasonableness" standard in analyzing whether an officer used excessive force in violation of the Fourth Amendment.  Plumhoff v. Rickard, — S.Ct. —, No. 12-1117, 2014 WL 2178335, at *7 (May 27, 2014); Graham, 490 U.S. at 396.  "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Graham, 490 U.S. at 396.  A police officer's use of force must be viewed in context, and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id.  A court pays "careful

attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.

At the time Officer Halek allegedly kicked Elex in the face, Sergeant Roushar was struggling to control and handcuff Elex, and the officers were concerned about Elex's alleged possession of weapons. Halek argues the purpose of the kicks was to force Elex to move his hands out from under his body. However, Elex testified that Halek delivered a final kick to his face after he had been handcuffed. At that point, Elex was not resisting and was no longer a flight risk or an immediate threat to the officers. The kicks caused Elex's cheekbone to fracture, an injury requiring medical attention and prescription painkillers. The timing and location of Halek's kicks cannot be seen in the squad video, because Elex is not within the scope of the camera while he is on the ground. Viewing the facts alleged in the light most favorable to Elex, Halek's kicking Elex in the face after he had been handcuffed was an unreasonable use of force that violated Elex's clearly established Fourth Amendment right to be free from excessive force. See Krout, 583 F.3d at 566 ("[G]ratuitous force against a suspect who is handcuffed, not resisting, and fully subdued is objectively unreasonable under the Fourth Amendment."). Thus, Halek is not entitled to qualified immunity.

Elex contends Officer Glirbas and Sergeant Roushar are also liable for the force used by Halek because they failed to intervene on Elex's behalf. See Pl.'s Mem. Opp'n at 17. A police officer who fails to prevent the use of excessive force will be held liable where "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." Nance v.

11

Sammis, 586 F.3d 604, 612 (8th Cir. 2009) (quoting Floyd v. City of Detroit, 518 F.3d 398, 406 (6th Cir. 2008)).  The duty to intervene to prevent the excessive use of force arises "where the officer is aware of the abuse and the duration of the episode is sufficient to permit an inference of tacit collaboration."  Krout, 583 F.3d at 565.  For example, in Krout, several police officers watched two other officers punch, knee, and hit an arrestee in an attack that lasted five minutes.  Id. at 561, 566.  Nearby civilians who witnessed the attack testified that during the attack, the onlooking officers were "standing around, not doing or saying anything to stop the officers who were assaulting" the arrestee.  Id. at 561.  The Eighth Circuit Court of Appeals determined the observing officers were not entitled to qualified immunity because there was evidence from which a jury could find that the duration of the assault was "sufficient to afford the onlooking officers an opportunity to intervene."  Id. at 566.

Here, there is no evidence that Glirbas and Roushar observed Halek's kicks or that they had an adequate opportunity to prevent the kicks from occurring.[4]  Both Glirbas and Roushar testified that they did not see the three or four kicks Halek allegedly delivered to Elex's face. Further, the duration of the incident does not permit an inference Roushar and Glirbas tacitly collaborated in the excessive use of force or had an adequate opportunity to prevent it from occurring.  Less than a minute elapsed from the time Elex was pulled from the window of the stolen car to the time he was handcuffed and lifted off the ground.  See Enevoldsen Aff. Ex. 1 ("Squad Video") at 21:55–22:43.  During this time, Roushar was struggling with Elex and

---

[4] Elex's argument in support of the failure to intervene claim consists of a single sentence stating: "The unlawfulness of Defendants' treatment of Elex would have been clear to a reasonable officer in the situation, meaning Officers Roushar, Glirbas, and Halek each had an affirmative duty to intervene on Elex's behalf." Pl.'s Mem. Opp'n. at 17.

concentrating on securing him with handcuffs. Roushar Dep. at 29-32. Glirbas had to run around the stolen vehicle to reach Elex, who was already on the ground. Glirbas Dep. at 14-16; Squad Video at 21:55–22:14. By the time Glirbas reached Elex, Halek was backing the canine dog away from Elex. Glirbas Dep. at 15. There is no evidence that Glirbas and Rousher stood idly by and allowed the kicks to continue or that the length of the incident afforded them an opportunity to intervene. Accordingly, Glirbas and Roushar are entitled to qualified immunity on Elex's claim that they violated his Fourth Amendment right by failing to intervene. See O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988) (holding onlooking officer not liable for failure to intervene in beating where episode involved three quick blows and was not of sufficient duration to support conclusion that onlooking officer was tacit collaborator).

## C. Motion to Exclude Expert Witness

Defendants move to exclude Elex's expert witness Matthew Stiehm, who has been retained by Elex as a police practices and use of force expert. In his expert report, Stiehm analyzes the officers' and Elex's deposition testimony, police reports from the incident, and the squad car video of the pursuit and arrest. The report concludes with an opinion that the force used by the officers was "**objectively unreasonable**. The officers did not meet the criteria as set forth by the United States Supreme Court in Graham v. Connor, the totality of the circumstances and their contact with Plaintiff, did not provide a need for a this [sic] unreasonable application of force." Second Agnlokar Aff. [Docket No. 24] Ex. 1 (Expert Report) at 34 (emphasis in original).[5]

Defendants argue Stiehm's expert opinion testimony is inadmissible because: (1)

---

[5] The page number refers to the number in the ECF heading.

Stiehm's opinion includes improper legal conclusions as to whether the officers' use of force was objectively reasonable; (2) he opines on the credibility of the officers' deposition testimony; and (3) he has no special expertise in analyzing and interpreting video images. Elex argues Stiehm is qualified to testify as to police practices, including the use of force, and that his testimony will assist the jurors in understanding the case.

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

When evaluating the admissibility of expert testimony, a trial court serves as the gatekeeper to ensure the reliability and relevance of the expert testimony offered into evidence. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999). A trial court has broad discretion in fulfilling the gatekeeping role. Wagner v. Hesston Corp., 450 F.3d 756, 758 (8th Cir. 2006). The proffered testimony must be useful to the fact-finder, the expert must be qualified, and the proposed evidence must be reliable. Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001). The proponent of the expert testimony bears the burden of showing by a preponderance of the evidence that the testimony is admissible. Id. "[R]ejection of expert testimony is the exception rather than the rule," and expert testimony should be admitted if it "advances the trier of fact's understanding to any degree." Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006).

An expert's opinion on the reasonableness of police conduct in light of Fourth Amendment standards is an impermissible legal conclusion and is not admissible. Schmidt v. City of Bella Villa, 557 F.3d 564, 570 (8th Cir. 2009); Peterson v. City of Plymouth, 60 F.3d 469, 475 (8th Cir. 1995); Redd v. Abla-Reyes, Civ. No. 12-465, 2013 WL 6036697, at *2 (D. Minn. Nov. 14, 2013). Thus, Stiehm may not testify as to whether Defendants' force was reasonable under the Fourth Amendment.

Stiehm will also be precluded from opining on the accuracy of the police officers' reports and depositions concerning the incident. Making credibility determinations is the exclusive role of the jury, and a jury is capable of making such determinations without the aid of an expert. United States v. Klime, 99 F.3d 870, 884 (8th Cir. 1996).

Additionally, Stiehm may not testify about his interpretation of the squad videos, because he has no special expertise in interpreting video images. Analyzing video images is within the jury's knowledge and ability, thus Stiehm's analysis of the videos would not assist the jury. See Lee v. Andersen, 616 F.3d 803, 809 (8th Cir. 2010) (holding trial court properly excluded expert testimony about video images where jury was capable of analyzing the images); Redd, 2013 WL 6036697, at *2 (excluding expert's opinion of surveillance video where expert used no special expertise in forming opinion and ability to discern video images was within jury's knowledge or experience).

Elex argues that if the Court limits Stiehm's testimony, it should still permit him to testify that Defendants' pursuit of the vehicle did not comply with the Brooklyn Park Police Department's pursuit and use of force policies. This testimony is no longer relevant, as Elex has not argued Defendants used excessive force to end the pursuit or that he was injured as a result

15

of the collision. Elex also contends Stiehm should be permitted to testify that Defendants' belief the stolen vehicle contained firearms did not justify Defendants' use of force. As noted above, however, an expert's opinion as to whether a police officer's use of force was reasonable under the circumstances is an impermissible legal conclusion.

There do not appear to be any remaining issues for which Stiehm's expert testimony is relevant. However, to the extent Plaintiff believes other testimony by Stiehm remains relevant, the Court will allow Plaintiff to make an offer of proof at trial, and the Court will rule on the admissibility of the offered testimony at that time.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment [Docket No. 14] is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a. Summary judgment is granted as to Defendants Chad Glirbas, Robert Roushar, and City of Brooklyn Park on all claims, and those Defendants are dismissed from this case.

    b. Summary judgment is granted as to the claim of intentional infliction of emotional distress (Count II), and that claim is dismissed from this case.

    c. Summary judgment is denied as to the claim under 42 U.S.C. § 1983 (Count I) against Defendant Jeremy Halek.

2. Defendants' Motion to Exclude Plaintiff's Expert Witness [Docket No. 21] is

**GRANTED IN PART** and **DENIED IN PART**.

BY THE COURT:

s/Ann D. Montgomery

Dated: May 29, 2014

ANN D. MONTGOMERY
U.S. DISTRICT JUDGE